Exhibit 10



# Congressional Record

United States of America  PROCEEDINGS AND DEBATES OF THE 116th CONGRESS, SECOND SESSION

*Vol. 166*     WASHINGTON, MONDAY, DECEMBER 7, 2020     *No. 206*

# House of Representatives

The House met at noon and was called to order by the Speaker pro tempore (Mr. CUELLAR).

## DESIGNATION OF THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore laid before the House the following communication from the Speaker:

                WASHINGTON, DC,
                *December 7, 2020.*
I hereby appoint the Honorable HENRY CUELLAR to act as Speaker pro tempore on this day.
                NANCY PELOSI,
    *Speaker of the House of Representatives.*

## PRAYER

The Chaplain, the Reverend Patrick J. Conroy, offered the following prayer:

Loving God, we give You thanks for giving us another day.

In the waning days of this 116th Congress, we ask Your blessing upon the Members of this people's House and, most especially, upon leadership. It is on their shoulders the most important negotiations of this Congress have been placed.

The coronavirus continues to ravage communities throughout the Nation. Bless the Members here with the good will and courage to work through differences to find assistance for so many Americans in dire need at this time. Help and empower them also as they work toward a total funding of our government into a stronger and more hopeful future.

Bless, as well, those who labor among our sick. Keep them safe and bless their families for their generosity during these times.

May all that is done be for Your greater honor and glory.

Amen.

## THE JOURNAL

The SPEAKER pro tempore. Pursuant to section 4(a) of House Resolution 967, the Journal of the last day's proceedings is approved.

## PLEDGE OF ALLEGIANCE

The SPEAKER pro tempore. Will the gentleman from California (Mr. GARCIA) come forward and lead the House in the Pledge of Allegiance.

Mr. GARCIA of California led the Pledge of Allegiance as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## ANNOUNCEMENT BY THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore. Under clause 5(d) of rule XX, the Chair announces to the House that, in light of the resignation of the gentleman from California (Mr. COOK), the whole number of the House is 430.

## ANNOUNCEMENT BY THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore. The Chair will entertain up to 15 requests for 1-minute speeches on each side of the aisle.

## HONORING THE LIFE OF GEORGE YUREK

(Mr. CARTWRIGHT asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. CARTWRIGHT. Mr. Speaker, as we mark today, the 79th year since Pearl Harbor, I want to tell you about my friend, George Yurek, who, when he got into the Army in 1942, volunteered for bomb disposal. He went to Corregidor, "The Rock" of the Philippines.

His unit was in the first amphibious wave on the island. There were so many landmines there that, with U.S. troops amassing for landing, they had very little time. They had to defuse the landmines by hand, and they called for volunteers.

Sergeant George Yurek of West Wyoming, Pennsylvania, volunteered to defuse landmines by hand, and he defused hundreds of them. It is impossible to count how many American troops he saved by his actions.

For his heroism in the Pacific, George Yurek was awarded a total of four Bronze Stars for valor.

Last week, at the age of 98, George passed away, after mentoring countless young people in all the Wyoming Valley.

George and his late wife, Ellie, were married for 67 years. They leave three children, Greg, George, and Ann, and seven grandchildren.

May God rest his soul.

## HONORING THE LIFE OF CHERI FLEMING

(Mr. GARCIA of California asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. GARCIA of California. Mr. Speaker, I rise today to pay tribute to a dear friend and to honor the life of someone very special to my hometown of Santa Clarita.

Ms. Cheri Fleming, a radiant mom, a beautiful wife, a savvy businesswoman, and an avid philanthropist, passed away on November 16.

Cheri was an icon in the Santa Clarita Valley. She was the brilliant and shining essence of everything that is great about my hometown. She led with grace. She succeeded in business with humility. She supported charities with endless generosity. She loved her friends and family intensely, always giving one of the most warm hugs you can imagine.

As a philanthropist, Cheri was one of the primary reasons why so many nonprofit organizations in our district are

---

☐ This symbol represents the time of day during the House proceedings, e.g., ☐ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.

H6861


Printed on recycled paper.

Case 2:23-cv-20964-SRC-MAH   Document 41-11   Filed 02/20/24   Page 3 of 7 PageID: 1698



# Congressional Record

United States of America

PROCEEDINGS AND DEBATES OF THE *116th* CONGRESS, SECOND SESSION

*Vol. 166*     WASHINGTON, MONDAY, DECEMBER 7, 2020     *No. 206*

## Senate

The Senate met at 3 p.m. and was called to order by the President pro tempore (Mr. GRASSLEY).

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Great Redeemer, guide our lawmakers along the best path to fulfill Your purposes on Earth. May they submit to Your wisdom and providential leading, believing that You will supply all of their needs. Remind them that Your unfailing love accompanies those who put their trust in You.

Lord, give our Senators an attitude of reverential awe that will keep them from evil and inspire them to rejoice and be glad as they strive to live lives of purity and obedience.

And, Lord, as we remember Pearl Harbor on this December 7, thank You for Your loving and prevailing providence. May we show our gratitude by facing the future without fear.

We pray in Your majestic Name. Amen.

### PLEDGE OF ALLEGIANCE

The President pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

The PRESIDING OFFICER (Mr. HAWLEY). The Senator from Iowa.

Mr. GRASSLEY. Mr. President, I ask unanimous consent to speak for 1 minute in morning business.

The PRESIDING OFFICER. Without objection, it is so ordered.

### RECOGNIZING IOWA STATE UNIVERSITY FOOTBALL

Mr. GRASSLEY. Mr. President, I want to visit with my colleagues about something that hasn't happened in Iowa for over 100 years. Over the weekend, the Iowa State football team completed their regular season play. The Cyclones are having a noteworthy season. They secured the first place rank in the Big 12 Conference's regular season after winning five consecutive conference games and eight overall conference wins this season.

The good news doesn't stop there for the Iowa State football program. The Cyclones finished first place in league play, for the first time since 1912, when they won the Missouri Valley Conference. This has earned the Cyclones their well-deserved spot in the Big 12 title game on December 19, the first ever Big 12 championship appearance in Iowa State University's history.

I want to applaud the Cyclones for their historic season. So many fans, including me, will be rooting them on for the Big 12 championship game.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. LEAHY. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

### RESERVATION OF LEADER TIME

The PRESIDING OFFICER. Under the previous order, the leadership time is reserved.

### CONCLUSION OF MORNING BUSINESS

The PRESIDING OFFICER. Morning business is closed.

### EXECUTIVE SESSION

### EXECUTIVE CALENDAR

The PRESIDING OFFICER. Under the previous order, the Senate will proceed to executive session to resume consideration of the following nomination, which the clerk will report.

The legislative clerk read the nomination of Stephen Sidney Schwartz, of Virginia, to be a Judge of the United States Court of Federal Claims for a term of fifteen years.

The PRESIDING OFFICER. The Senator from Vermont.

#### CORONAVIRUS

Mr. LEAHY. Mr. President, speaking both as a Senator from Vermont and as vice chairman of the Senate Appropriations Committee, I am speaking with concern about what has been happening in the Senate.

It has been 321 days since the first COVID–19 case was reported in the United States—321 days. It has been 282 days since the first COVID–19 death was reported in the United States.

The Bureau of Labor Statistics reports that the unemployment rate in November was 6.7 percent, nearly double the rate in November of last year. Hundreds of thousands of small businesses across the country have closed permanently, all due to COVID.

As of today, there are more than 14,800,000 reported cases of COVID–19 in the United States. To put that in perspective, that is 1 million more than just a week ago. More than 282,000 Americans have died, and it has been 256 days since the Senate passed the CARES Act—256 days since the Senate acted in a comprehensive, meaningful way to address the real and mounting concerns and needs of our constituents.

My State of Vermont is like everywhere else. Healthcare workers, caregivers, business owners, employees, teachers, and students are all in need of support during these difficult and uncertain times.

We have families wrestling with heightened food insecurity. People for the first time in their lives cannot feed their children and they cannot feed themselves. They have the threat of eviction from their homes hanging over them.

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



fiscal responsibility, and his work on farm policy: Now, therefore, be it

*Resolved,* That—

(1) the Senate has heard with profound sorrow and deep regret the announcement of the death of the Honorable Roger William Jepsen, former member of the United States Senate from the State of Iowa;

(2) the Senate respectfully requests that the Secretary of the Senate—

(A) communicate this resolution to the House of Representatives; and

(B) transmit an enrolled copy of this resolution to the family of the Honorable Roger William Jepsen; and

(3) when the Senate adjourns today, it stand adjourned as a further mark of respect to the memory of the Honorable Roger William Jepsen.

## AMENDMENTS SUBMITTED AND PROPOSED

SA 2692. Mr. MARKEY submitted an amendment intended to be proposed by him to the bill S. 2054, to posthumously award the Congressional Gold Medal, collectively, to Glen Doherty, Tyrone Woods, J. Christopher Stevens, and Sean Smith, in recognition of their contributions to the Nation; which was referred to the Committee on Banking, Housing, and Urban Affairs.

SA 2693. Mr. MCCONNELL (for Mr. ALEXANDER) proposed an amendment to the bill H.R. 1503, to amend the Federal Food, Drug, and Cosmetic Act regarding the list under section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act, and for other purposes.

## TEXT OF AMENDMENTS

**SA 2692.** Mr. MARKEY submitted an amendment intended to be proposed by him to the bill S. 2054, to posthumously award the Congressional Gold Medal, collectively, to Glen Doherty, Tyrone Woods, J. Christopher Stevens, and Sean Smith, in recognition of their contributions to the Nation; which was referred to the Committee on Banking, Housing, and Urban Affairs; as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. FINDINGS.**

Congress makes the following findings:

(1) On September 11, 2012, the United States consulate, and its personnel in Benghazi, Libya, were attacked by militants.

(2) Four Americans were killed in the attack, including Ambassador J. Christopher Stevens, Sean Smith, Glen Doherty, and Tyrone Woods.

(3) Glen Doherty and Tyrone Woods were former Navy SEALs who served as security personnel in Libya. As the attack unfolded, they bravely attempted to defend American property and protect United States diplomatic personnel. In so doing, they selflessly sacrificed their own lives.

(4) Glen Doherty was a Navy SEAL for 12 years and served in Iraq and Afghanistan. He attained the rank of Petty Officer First Class and earned the Navy and Marine Corps Commendation Medal. After leaving the Navy, Glen Doherty worked with the Department of State to protect American diplomats.

(5) Tyrone Woods served for 20 years as a Navy SEAL including tours in Iraq and Afghanistan. In Iraq he led multiple raids and reconnaissance missions and earned the Bronze Star. After retiring from the Navy as a Senior Chief Petty Officer, Tyrone Woods worked with the Department of State to protect American diplomats.

(6) J. Christopher Stevens served for 21 years in the U.S. Foreign Service. He was serving as U.S. Ambassador to Libya and previously served twice in the country, as both Special Representative to the Libyan Transitional National Council and as the Deputy Chief of Mission. Earlier in his life, he also served as a Peace Corps volunteer teaching English in Morocco.

(7) Sean Smith served for 6 years in the U.S. Air Force. He attained the rank of Staff Sergeant and was awarded the Air Force Commendation Medal. After leaving the Air Force, Sean Smith served for 10 years in the State Department on various assignments, which took him to places such as Baghdad, Brussels, Pretoria, and The Hague.

(8) As their careers attest, all four men served their country honorably.

**SEC. 2. CONGRESSIONAL GOLD MEDAL.**

(a) AWARD AUTHORIZED.—The Speaker of the House of Representatives and the President pro tempore of the Senate shall make appropriate arrangements for the posthumous award, on behalf of the Congress, of a single gold medal of appropriate design collectively in commemoration of Glen Doherty, Tyrone Woods, J. Christopher Stevens, and Sean Smith, in recognition of their contributions to the Nation.

(b) DESIGN AND STRIKING.—For the purposes of the award referred to in subsection (a), the Secretary of the Treasury (hereafter in this Act referred to as the "Secretary") shall strike the gold medal with suitable emblems, devices, and inscriptions, to be determined by the Secretary.

(c) CENTRAL INTELLIGENCE AGENCY MUSEUM.—

(1) IN GENERAL.—Following the award of the gold medal under subsection (a), the gold medal shall be given to the Central Intelligence Agency Museum, where it will be displayed as appropriate and made available for research.

(2) SENSE OF CONGRESS.—It is the sense of Congress that the Central Intelligence Agency Museum should make the gold medal received under paragraph (1) available for display elsewhere, particularly at other appropriate locations associated with Glen Doherty, Tyrone Woods, J. Christopher Stevens, and Sean Smith.

**SEC. 3. DUPLICATE MEDALS.**

Under such regulations as the Secretary may prescribe, the Secretary may strike and sell duplicates in bronze of the gold medal struck under section 2, at a price sufficient to cover the costs of the medals, including labor, materials, dies, use of machinery, and overhead expenses.

**SEC. 4. NATIONAL MEDALS.**

Medals struck pursuant to this Act are national medals for purposes of chapter 51 of title 31, United States Code.

**SA 2693.** Mr. MCCONNELL (for Mr. ALEXANDER) proposed an amendment to the bill H.R. 1503, to amend the Federal Food, Drug, and Cosmetic Act regarding the list under section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act, and for other purposes; as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Orange Book Transparency Act of 2020".

**SEC. 2. ORANGE BOOK MODERNIZATION.**

(a) SUBMISSION OF PATENT INFORMATION FOR BRAND NAME DRUGS.—

(1) IN GENERAL.—Paragraph (1) of section 505(b) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(b)) is amended to read as follows:

"(b)(1)(A) Any person may file with the Secretary an application with respect to any drug subject to the provisions of subsection (a). Such persons shall submit to the Secretary as part of the application—

"(i) full reports of investigations which have been made to show whether such drug is safe for use and whether such drug is effective in use;

"(ii) a full list of the articles used as components of such drug;

"(iii) a full statement of the composition of such drug;

"(iv) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug;

"(v) such samples of such drug and of the articles used as components thereof as the Secretary may require;

"(vi) specimens of the labeling proposed to be used for such drug;

"(vii) any assessments required under section 505B; and

"(viii) the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug, and that—

"(I) claims the drug for which the applicant submitted the application and is a drug substance (active ingredient) patent or a drug product (formulation or composition) patent; or

"(II) claims a method of using such drug for which approval is sought or has been granted in the application.

"(B) If an application is filed under this subsection for a drug, and a patent of the type described in subparagraph (A)(viii) is issued after the filing date but before approval of the application, the applicant shall amend the application to include the patent number and expiration date.".

(b) SUBSEQUENT SUBMISSION OF PATENT INFORMATION.—

(1) IN GENERAL.—Section 505(c)(2) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(c)(2)) is amended—

(A) by inserting before the first sentence the following: "Not later than 30 days after the date of approval of an application submitted under subsection (b), the holder of the approved application shall file with the Secretary the patent number and the expiration date of any patent described in subsection (b)(1)(A)(viii), except that a patent that is identified as claiming a method of using such drug shall be filed only if the patent claims a method of use approved in the application. If a patent described in subsection (b)(1)(A)(viii) is issued after the date of approval of an application submitted under subsection (b), the holder of the approved application shall, not later than 30 days after the date of issuance of the patent, file the patent number and the expiration date of the patent, except that a patent that claims a method of using such drug shall be filed only if approval for such use has been granted in the application.";

(B) in the first sentence following the sentences added by subparagraph (A), by striking "which claims the drug for which" and all that follows through "of the drug." and inserting "described in subsection (b)(1)(A)(viii).";

(C) in the second sentence following the sentences added by subparagraph (A), by inserting after "could not file patent information under subsection (b) because no patent" the following: "of the type for which information is required to be submitted in subsection (b)(1)(A)(viii)"; and

(D) by adding at the end the following: "Patent information that is not the type of patent information required by subsection

(b)(1)(A)(viii) shall not be submitted under this paragraph.''.

(2) UPDATING LIST.—Clause (iii) of section 505(j)(7)(A) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)) is amended by striking ''(b) or''.

(c) LISTING OF EXCLUSIVITIES.—Subparagraph (A) of section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)) is amended by adding at the end the following:

''(iv) For each drug included on the list, the Secretary shall specify any exclusivity period that is applicable, for which the Secretary has determined the expiration date, and for which such period has not yet expired, under—

''(I) clause (ii), (iii), or (iv) of subsection (c)(3)(E);

''(II) clause (iv) or (v) of paragraph (5)(B);

''(III) clause (ii), (iii), or (iv) of paragraph (5)(F);

''(IV) section 505A;

''(V) section 505E;

''(VI) section 527(a); or

''(VII) subsection (u).''.

(d) ORANGE BOOK UPDATES WITH RESPECT TO INVALIDATED PATENTS.—

(1) AMENDMENT.—Section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)) is amended by adding at the end the following:

''(D) In the case of a listed drug for which the list under subparagraph (A)(i) includes a patent for such drug, and any claim of the patent has been cancelled or invalidated pursuant to a final decision issued by the Patent Trial and Appeal Board of the United States Patent and Trademark Office or by a court, from which no appeal has been, or can be, taken, if the holder of the applicable application approved under subsection (c) determines that a patent for such drug, or any patent information for such drug, no longer meets the listing requirements under this section—

''(i) the holder of such approved application shall notify the Secretary, in writing, within 14 days of such decision of such cancellation or invalidation and request that such patent or patent information, as applicable, be amended or withdrawn in accordance with the decision issued by the Patent Trial and Appeal Board or a court;

''(ii) the holder of such approved application shall include in any notification under clause (i) information related to such patent cancellation or invalidation decision and submit such information, including a copy of such decision, to the Secretary; and

''(iii) the Secretary shall, in response to a notification under clause (i), amend or remove patent or patent information in accordance with the relevant decision from the Patent Trial and Appeals Board or court, as applicable, except that the Secretary shall not remove from the list any patent or patent information before the expiration of any 180-day exclusivity period under paragraph (5)(B)(iv) that relies on a certification described in paragraph (2)(A)(vii)(IV).''.

(2) APPLICABILITY.—Subparagraph (D) of section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)), as added by paragraph (1), applies only with respect to a decision described in such subparagraph that is issued on or after the date of enactment of this Act.

(e) REVIEW AND REPORT.—Not later than 1 year after the date of enactment of this Act, the Secretary of Health and Human Services, acting through the Commissioner of Food and Drugs, shall—

(1) solicit public comment regarding the types of patent information that should be included on, or removed from, the list under section 507(j)(7) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)); and

(2) transmit to Congress a summary of such comments and actions the Food and Drug Administration is considering taking, if any, in response to public comment pursuant to paragraph (1) about the types of patent information that should be included or removed from such list.

(f) GAO REPORT TO CONGRESS.—

(1) IN GENERAL.—Not later than 2 years after the date of enactment of this Act, the Comptroller General of the United States (referred to in this section as the ''Comptroller General'') shall submit to the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Energy and Commerce of the House of Representatives a report on the patents included in the list published under section 505(j)(7) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. 355(j)(7)) that claim an active ingredient or formulation of a drug in combination with a device that is used for delivery of such drug, including an analysis of such patents and their claims.

(2) CONTENT.—The Comptroller General shall include in the report under paragraph (1)—

(A) data on—

(i) the number of patents included in the list published under section 505(j)(7) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. 355(j)(7)) that claim the active ingredient or formulation of a drug in combination with a device that is used for delivery of the drug, and that together claim the finished dosage form of the drug; and

(ii) the number of claims with respect to each patent included in the list published under such section 505(j)(7) that claim a device that is used for the delivery of the drug, but do not claim such device in combination with an active ingredient or formulation of a drug;

(B) an analysis of the listing of patents described in subparagraph (A)(ii), including the timing of listing such patents in relation to patents described in subparagraph (A)(i), and the effect listing the patents described in subparagraph (A)(ii) has on market entry of one or more drugs approved under section 505(j) of the Federal Food, Drug, and Cosmetic Act as compared to the effect of not listing the patents described in subparagraph (A)(ii); and

(C) recommendations about which kinds of patents relating to devices described in subparagraph (A)(i) should be submitted to the Secretary of Health and Human Services for inclusion on the list under section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act and which patents should not be required to be so submitted in order to reduce barriers to approval and market entry.

(g) CONFORMING AMENDMENTS.—Section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) is amended—

(1) in subsection (c)(3)(E), by striking ''clause (A) of subsection (b)(1)'' each place it appears and inserting ''subsection (b)(1)(A)(i)''; and

(2) in subsection (j)(2)(A)(vi), by striking ''clauses (B) through (F) of subsection (b)(1)'' and inserting ''clauses (ii) through (vi) of subsection (b)(1)(A)''.

PRIVILEGES OF THE FLOOR

Mr. HAWLEY. Mr. President, in recognition of his outstanding service to my office this last year, I ask unanimous consent that Captain Ryan Albin, the defense fellow in my office, be granted floor privileges for the remainder of this Congress.

The PRESIDING OFFICER. Without objection, it is so ordered.

RELATING TO THE DEATH OF THE HONORABLE ROGER WILLIAM JEPSEN, FORMER UNITED STATES SENATOR FOR THE STATE OF IOWA

Mr. McCONNELL. Mr. President, I ask unanimous consent that the Senate proceed to the consideration of S. Res. 795, submitted earlier today.

The PRESIDING OFFICER. The clerk will report the resolution by title.

The senior assistant legislative clerk read as follows:

A resolution (S. Res. 795) relating to the death of the Honorable Roger William Jepsen, former United States Senator for the State of Iowa.

There being no objection, the Senate proceeded to consider the resolution.

Mr. McCONNELL. Mr. President, I ask unanimous consent that the resolution be agreed to, the preamble be agreed to, and the motions to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 795) was agreed to.

The preamble was agreed to.

(The resolution, with its preamble, is printed in today's RECORD under ''Submitted Resolutions.'')

DHS OPIOID DETECTION RESILIENCE ACT OF 2019

Mr. McCONNELL. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 502, H.R. 4761.

The PRESIDING OFFICER. The clerk will report the bill by title.

The senior assistant legislative clerk read as follows:

A bill (H.R. 4761) to ensure U.S. Customs and Border Protection officers, agents, and other personnel have adequate synthetic opioid detection equipment, that the Department of Homeland Security has a process to update synthetic opioid detection capability, and for other purposes.

There being no objection, the Senate proceeded to consider the bill.

Mr. McCONNELL. I ask unanimous consent that the bill be considered read a third time and passed and the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill (H.R. 4761) was ordered to a third reading, was read the third time, and passed.

SECURING AMERICA'S PORTS ACT

Mr. McCONNELL. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 530, H.R. 5273.

The PRESIDING OFFICER. The clerk will report the bill by title.

The senior assistant legislative clerk read as follows:

A bill (H.R. 5273) to require the Secretary of Homeland Security to develop a plan to

increase to 100 percent the rates of scanning of commercial and passenger vehicles entering the United States at land ports of entry along the border using large-scale non-intrusive inspection systems to enhance border security, and for other purposes.

There being no objection, the Senate proceeded to consider the bill, which had been reported from the Committee on Homeland Security and Governmental Affairs, with an amendment to strike all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Securing America's Ports Act".

**SEC. 2. LARGE-SCALE NON-INTRUSIVE INSPECTION SCANNING PLAN.**

(a) DEFINITIONS.—In this section:

(1) LARGE-SCALE NON-INTRUSIVE INSPECTION SYSTEM.—The term "large-scale, non-intrusive inspection system" means a technology, including x-ray, gamma-ray, and passive imaging systems, capable of producing an image of the contents of a commercial or passenger vehicle or freight rail car in 1 pass of such vehicle or car.

(2) SCANNING.—The term "scanning" means utilizing nonintrusive imaging equipment, radiation detection equipment, or both, to capture data, including images of a commercial or passenger vehicle or freight rail car.

(b) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Homeland Security shall submit a plan to the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives for increasing to 100 percent the rate of high-throughput scanning of commercial and passenger vehicles and freight rail traffic entering the United States at land ports of entry and rail-border crossings along the border using large-scale non-intrusive inspection systems or similar technology to enhance border security.

(c) BASELINE INFORMATION.—The plan under subsection (b) shall include, at a minimum, the following information regarding large-scale non-intrusive inspection systems or similar technology operated by U.S. Customs and Border Protection at land ports of entry and rail-border crossings as of the date of the enactment of this Act:

(1) An inventory of large-scale non-intrusive inspection systems or similar technology in use at each land port of entry.

(2) For each system or technology identified in the inventory under paragraph (1)—

(A) the scanning method of such system or technology;

(B) the location of such system or technology at each land port of entry that specifies whether in use in pre-primary, primary, or secondary inspection area, or some combination of such areas;

(C) the percentage of commercial and passenger vehicles and freight rail traffic scanned by such system or technology;

(D) seizure data directly attributed to scanned commercial and passenger vehicles and freight rail traffic; and

(E) the number of personnel required to operate each system or technology.

(3) Information regarding the continued use of other technology and tactics used for scanning, such as canines and human intelligence in conjunction with large scale, nonintrusive inspection systems.

(d) ELEMENTS.—The plan under subsection (b) shall include the following information:

(1) Benchmarks for achieving incremental progress towards 100 percent high-throughput scanning within the next 6 years of commercial and passenger vehicles and freight rail traffic entering the United States at land ports of entry and rail-border crossings along the border with corresponding projected incremental improvements in scanning rates by fiscal year and rationales for the specified timeframes for each land port of entry.

(2) Estimated costs, together with an acquisition plan, for achieving the 100 percent high-throughput scanning rate within the timeframes specified in paragraph (1), including acquisition, operations, and maintenance costs for large-scale, nonintrusive inspection systems or similar technology, and associated costs for any necessary infrastructure enhancements or configuration changes at each port of entry. Such acquisition plan shall promote, to the extent practicable, opportunities for entities that qualify as small business concerns (as defined under section 3(a) of the Small Business Act (15 U.S.C. 632(a)).

(3) Any projected impacts, as identified by the Commissioner of U.S. Customs and Border Protection, on the total number of commercial and passenger vehicles and freight rail traffic entering at land ports of entry and rail-border crossings where such systems are in use, and average wait times at peak and non-peak travel times, by lane type if applicable, as scanning rates are increased.

(4) Any projected impacts, as identified by the Commissioner of U.S. Customs and Border Protection, on land ports of entry and rail-border crossings border security operations as a result of implementation actions, including any changes to the number of U.S. Customs and Border Protection officers or their duties and assignments.

(e) ANNUAL REPORT.—Not later than 1 year after the submission of the plan under subsection (b), and biennially thereafter for the following 6 years, the Secretary of Homeland Security shall submit a report to the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Homeland Security of the House of Representatives that describes the progress implementing the plan and includes—

(1) an inventory of large-scale, nonintrusive inspection systems or similar technology operated by U.S. Customs and Border Protection at each land port of entry;

(2) for each system or technology identified in the inventory required under paragraph (1)—

(A) the scanning method of such system or technology;

(B) the location of such system or technology at each land port of entry that specifies whether in use in pre-primary, primary, or secondary inspection area, or some combination of such areas;

(C) the percentage of commercial and passenger vehicles and freight rail traffic scanned by such system or technology; and

(D) seizure data directly attributed to scanned commercial and passenger vehicles and freight rail traffic;

(3) the total number of commercial and passenger vehicles and freight rail traffic entering at each land port of entry at which each system or technology is in use, and information on average wait times at peak and non-peak travel times, by lane type if applicable;

(4) a description of the progress towards reaching the benchmarks referred to in subsection (d)(1), and an explanation if any of such benchmarks are not achieved as planned;

(5) a comparison of actual costs (including information on any awards of associated contracts) to estimated costs set forth in subsection (d)(2);

(6) any realized impacts, as identified by the Commissioner of U.S. Customs and Border Protection, on land ports of entry and rail-border crossings operations as a result of implementation actions, including any changes to the number of U.S. Customs and Border Protection officers or their duties and assignments;

(7) any proposed changes to the plan and an explanation for such changes, including changes made in response to any Department of Homeland Security research and development findings or changes in terrorist or transnational criminal organizations tactics, techniques, or procedures; and

(8) any challenges to implementing the plan or meeting the benchmarks, and plans to mitigate any such challenges.

Mr. McCONNELL. I ask unanimous consent that the committee-reported substitute amendment be agreed to; that the bill, as amended, be considered read a third time and passed; and that the amendment to the title be agreed to; and the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The committee-reported amendment in the nature of a substitute was agreed to.

The amendment was ordered to be engrossed and the bill to be read a third time.

The bill was read the third time.

The bill (H.R. 5273), as amended, was passed.

The committee-reported amendment to the title was agreed to, as follows:

Amend the title so as to read: "An Act to require the Secretary of Homeland Security to develop a plan to increase to 100 percent the rates of scanning of commercial and passenger vehicles and freight rail entering the United States at land ports of entry along the border using large-scale, nonintrusive inspection systems to enhance border security, and for other purposes.".

---

## ORANGE BOOK TRANSPARENCY ACT OF 2019

Mr. McCONNELL. Mr. President, I ask unanimous consent that the Committee on Health, Education, Labor, and Pensions be discharged from further consideration of H.R. 1503 and the Senate proceed to its immediate consideration.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will read the bill by title.

A bill (H.R. 1503) to amend the Federal Food, Drug, and Cosmetic Act regarding the list under section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act, and for other purposes.

There being no objection, the committee was discharged and the Senate proceeded to consider the bill.

Mr. McCONNELL. I ask unanimous consent that the Alexander substitute amendment at the desk be agreed to; the bill, as amended, be considered read a third time and passed; and the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment (No. 2693), in the nature of a substitute, was agreed to.

(The amendment is printed in today's RECORD under "Text of Amendments.")

The amendment was ordered to be engrossed and the bill to be read a third time.

The bill was read the third time.

The bill (H.R. 1503), as amended, was passed.

### ORDERS FOR TUESDAY, DECEMBER 8, 2020

Mr. McCONNELL. Mr. President, I ask unanimous consent that when the Senate completes its business today, it adjourn until 10 a.m., Tuesday, December 8; further, that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, and morning business be closed; further, that following leader remarks, the Senate proceed to executive session and resume consideration of the Simington nomination under the previous order. Finally, I ask that the Senate recess following the cloture vote on the Simington nomination until 2:15 p.m. to allow for the weekly conference meetings.

The PRESIDING OFFICER. Without objection, it is so ordered.

### ADJOURNMENT UNTIL 10 A.M. TOMORROW

Mr. McCONNELL. Mr. President, if there is no further business to come before the Senate, I ask unanimous consent that it stand adjourned under the provisions of S. Res. 795 and do so as a further mark of respect for the late Roger William Jepsen, former Senator from Iowa.

There being no objection, the Senate, at 6:40 p.m., adjourned until Tuesday, December 8, 2020, at 10 a.m.